IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>BRYAN JACOBS. | Crim. Action No. 10-801<br><br>**OPINION** |

<u>Appearances</u>

Justin C. Danilewitz
Diana V. Carrig
Office of the U.S. Attorney
District of New Jersey
401 Market Street
4th Floor
Camden, NJ  08102
     Attorneys for the Government

Peter A. Levin
1927 Hamilton Street
Philadelphia, PA  19130
     Attorney for Defendant

**BUMB**, United States District Judge:

This matter comes before the Court for a determination of the appropriate award of mandatory restitution pursuant to 18 U.S.C.A. § 2259. On October 1, 2013, Defendant Bryan Jacobs (the "Defendant") pled guilty to Count Six of the Superseding Indictment, which charged Defendant with receipt of child pornography from a minor hereinafter referred to as "CV1" on November 30, 2008 in violation of 18 U.S.C.A. § 2252A(a)(2)(A) and (b)(1). (<u>See</u> Dkt. Ents. 41, 77.) On May 28, 2014, this Court

1

sentenced Defendant to the statutory maximum term of 20 years' imprisonment with 15 years' supervised release. The Court also scheduled a restitution hearing for July 15, 2014. (Dkt. Ent. 83.) On July 10, 2014, the parties requested that this Court adjourn the proceedings so as to "afford the parties sufficient opportunity to gather evidence and brief the restitution issue more fully." (Dkt. Ent. 88.) The Court adjourned the hearing to August 7, 2014. (Dkt. Ent. 89.)

Pursuant to § 2259, Defendant must pay the "victim" of a Chapter 110 offense, which includes the charge to which Defendant pled guilty, "the full amount of the victim's losses as determined by the court." 18 U.S.C.A. § 2259(b)(1). A "victim" means "the individual harmed as a result of a commission of a crime under this chapter . . . ." § 2259(c).

The parties agree that restitution is limited to the specific conduct that forms the basis for the "offense of conviction," and does not include other relevant conduct that is not clearly caused by the offense of conviction. (Gov.'s Mem. at 5-8 (citing Hughey v. United States, 495 U.S. 411, 413 (1990)); Def.'s Mem. at 1; see also Aug. 7, 2014 Tr. 3:8-23.) Accordingly, because the offense of conviction here, Count Six, relates solely to possession of an image of CV1, the parties agree that CV1 is the only cognizable victim to whom restitution should be awarded.

2

The "full amount of the victim's losses" includes

(A) medical services relating to physical, psychiatric, or psychological care;
(B) physical and occupational therapy or rehabilitation;
(C) necessary transportation, temporary housing, and child care expenses;
(D) lost income;
(E) attorneys' fees, as well as other costs incurred; and
(F) any other losses suffered by the victim as a proximate result of the offense.

§ 2259(b)(3). The Government bears the burden of proving the amount of loss by a preponderance of the evidence. See 18 U.S.C.A. § 3664. Restitution may be awarded "only to the extent the defendant's offense proximately caused a victim's losses." Paroline v. U.S., 134 S. Ct. 1710, 1722 (2014). "But the victim's costs of treatment and lost income resulting from the trauma of knowing that images of [his] abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes, including possession, assuming the prerequisite of factual causation is satisfied." Id.

The Government contends, and this Court agrees, that Defendant should be held liable for the full amount of CV1's losses. As part of his plea agreement, Defendant stipulated to the fact that his offense involved a pattern of activity involving sexual abuse and exploitation of a minor. (Plea Agreement, Schedule A, Dkt. Ent. 76.) As part of his horrific scheme, Defendant obtained pornographic photographs of an

adolescent female from a website called teentopanga.com, which
he used to create a fictional persona named "Brianna." (PSR
dated Jan. 15, 2014 at ¶ 11.) Using this persona, Defendant
enticed young adolescent boys including CV1 to send him obscene
pornographic photographs of themselves. (Id.) Defendant elicited
- under these false pretenses - photographs from CV1 and others[1]
in specific poses, including sexually explicit photographs of
CV1 nude; in "thong" underwear; with an erection; bending over,
nude, with his hands placed so as to expose his anus; and nude
with a pen inserted into his rectum. (Id. at ¶ 9.) Cruelly,
Defendant threatened to share the photographs with CV1's friends
if CV1 refused to take and forward additional photographs. (Id.
at ¶ 13.) There can be no doubt that were it not for Defendant's
felonious conduct, CV1 would not have suffered the losses
discussed below.

The Court is mindful of the fact that a victim of child
pornography, like CV1, suffers in many ways. First, he is harmed
by the initial abuse. Here, Defendant directly exploited CV1,
eliciting obscene images under false pretenses, threatening CV1
to ensure compliance with Defendant's demands, and then
distributing those images to others. The child victim then

---

[1] According to the Presentence Investigation Report ("PSR"),
Government records indicate Defendant induced, enticed, or
coerced at least 19 child victims. (PSR dated Jan. 15, 2014 at
¶ 14.)

suffers secondary harms associated with the knowledge that the
tangible evidence of his exploitation is being viewed repeatedly
by other sexual predators. See Paroline, 134 S. Ct. at 1722. In
this case, the Government presented evidence consisting of a
Technical Assistance Request prepared by the National Center for
Missing & Exploited Children (NCMEC), which shows that CV1's
images have been seen in 1,013 reports and 17,781 files have
been associated with the "Harry" Series.[2] (Ex. 11; May 28, 2014
Tr. 141:23-142:4.) The Supreme Court in Paroline addressed the
question of how to award restitution where the defendant
possessed images of the victim but had "no other connection" to
the victim. Paroline, 134 S. Ct. 1722-29. The Court determined
that "courts applying § 2259 should order restitution in an
amount that comports with the defendant's relative role in the
causal process that underlies the victim's general losses." Id.
1727. In a case where the defendant had a direct role in
procuring the images from his victim, this Court finds it
appropriate to hold the defendant liable for the "full amount"
of the victim's losses, as determined below.[3]

_____

[2] The "Harry" series refers to a collection of pornographic
images depicting CV1. (PSR dated Jan. 15, 2014 at ¶ 12.)

[3] In doing so, the Court notes that it is entirely likely,
should any other defendants be convicted of possession of CV1's
image, that CV1 may seek restitution for those additional losses
that are proximately caused by those defendants' conduct.
Indeed, the Government recently informed the Court that
restitution may be sought on behalf of CV1 in a Western District

On behalf of CV1, the Government seeks to recover a total of $303,000, which can be broken down as follows:

| Type | Historic | Future |
|---|---|---|
| Mental Health | $60,000 | $60,000 |
| Medical | $2,000 | |
| Future Education/Lost Income | | $181,000 |

These amounts are based primarily upon a statement provided by CV1's mother, as well as a limited number of records that she was able to locate.[4] The Court addresses each category in turn.

**Mental Health**

The Government seeks an award of $60,000 for the cost of past mental health care during the period 2006-2014.[5] As noted above, the Government relies heavily on an estimation provided by CV1's mother. In addition, the Government submitted bills from Dr. Eliot Garson dating from April 2009 through December

---

of Texas matter in which CV1's image was found among electronic media in the defendant's possession. (See Gov.'s Ltr. dated Aug. 19, 2014.)

[4] CV1's mother explained that the dearth of supporting documentation is primarily due to residence relocations, divorce proceedings, and loss. (Gov.'s Mem., Ex. 1 at 1.)

[5] Although the Government in its Memorandum cited the time period as 2006 to 2011, it submitted records dating from 2009 to 2014.

2011 totaling $12,580[6]; 2010 quarterly billing records from Dr. Nupur Lahiri totaling $600; billing records covering a crisis intervention and suicide watch in March to April 2014 totaling $922.15 (Gov.'s Mem., Ex. 2); and billing records for care that occurred in April 2013 in connection with an apparent suicide attempt totaling $1,000 (Exs. 5, 6).

First, Defendant challenges the Government's request for restitution of expenses dating back to 2006 because there is no corroborating evidence that any such expenses were incurred. Although CV1's mother was unable to produce any billing records pre-dating April 2009, see supra, she explained in her statements that CV1 had sought therapy throughout the period from 2006 to 2011. (Gov.'s Mem., Ex. 1.) CV1's prior therapy was also acknowledged by Dr. Garson, who referred to CV1's "return to therapy" in Spring 2009. (Gov.'s Mem., Ex. 2.) This evidence is undisputed. Moreover, CV1's mother attended the restitution hearing, and the Court provided Defendant, as well as the Government, with the opportunity to call CV1's mother to testify. (See, e.g., Aug. 7, 2014 Tr. 13:1-10, 20:10-17.) Neither party was prepared to, or chose to, elicit her testimony, however, leaving the Court with her undisputed

---

[6] The Government seems to have missed a payment to Dr. Garson of $185, and thus misstates the total amount as $13,916.15. (Compare Gov.'s Mem. at 13, with Ex. 2.)

statements regarding CV1's mental health care during the
relevant period.[7] As the Third Circuit has repeatedly noted, "the
Federal Rules of Evidence do not apply in sentencing
proceedings," U.S. v. Campbell, 295 F.3d 398, 406 (3d Cir.
2002), but "information relied upon at sentencing must have
'sufficient indicia of reliability to support its probable
accuracy,'" U.S. v. Berry, 553 F.3d 273, 280 (3d Cir. 2009)
(quoting U.S. v. Warren, 186 F.3d 358, 364-65 (3d Cir. 1999)).
In addition, "the Confrontation Clause does not apply in the
sentencing context and does not prevent the introduction of
hearsay testimony at a sentencing hearing." U.S. v. Robinson,
482 F.3d 244, 246 (3d Cir. 2007); see also U.S. v. Brown, 534 F.
App'x 132, 137-38 (3d Cir. 2013). Given the fact that CV1's
mother's statement that CV1 engaged in therapy throughout the
relevant period is corroborated by Dr. Garson's statement, the
Court finds sufficient indicia of reliability supporting its
accuracy and thus the Court's reliance upon it.

Second, Defendant argues, that even if such evidence of
these expenses existed, the record does not show that CV1 was
aware that he was a victim of a sexual predator, specifically,
Defendant, prior to speaking with Sergeant Steven J. LaPorta.
Thus, there is no evidence that his need for counseling and

---

[7] Nor did Defendant object to CV1's mother's statements on
the grounds that they are unsworn.

other care at that time was proximately caused by Defendant's
wrongdoing. Defendant's myopic view of the harm CV1 suffered at
Defendant's hands fails to consider the very nature of
Defendant's conduct. Although Count Six, to which Defendant pled
guilty, relates to possession on November 30, 2008 of a single
image of CV1, the Government argued that Defendant was involved
with CV1 since at least September 2006.[8] Indeed, Defendant
stipulated to the fact that his offense involved a pattern of
activity involving sexual abuse and exploitation of a minor.
(Plea Agreement, Schedule A, Dkt. Ent. 76.) Moreover, the PSR –
to which Defendant did not object – noted that a staff analyst
with NCMEC "observed that metadata contained in some of the
photographs indicated that those photographs were created in

---

[8] In support, the Government introduced undated chats
between CV1 and Defendant, exhibit logs, metadata reports, and
images of CV1 that were purportedly named and categorized in a
fashion suggesting they were collected in or around September
2006. (See generally Aug. 7, 2014 Tr. 32-37.) For example, a
chat between CV1 and Defendant (Ex. 201) was saved under the
filename "Evan 92406.htm," and the metadata report shows that it
was last written on September 25, 2006 (see Ex. 295A). Moreover,
according to the Government, the file pathway reflects that this
chat was included in a folder titled "evan13," which corresponds
to CV1's age as of the purported date that the file was written.
(Aug. 7, 2014 Tr. 30-33.) Despite being given the opportunity to
present any evidence in support of its restitution application,
however, the Government failed to call any witnesses, including
the case agent, relying instead on counsel's "testimony" as to
the meaning of the metadata reports and the file-naming system
allegedly employed by Defendant. Nonetheless, the PSR also
reflects that Defendant's involvement with CV1 dates back to
2006.

September 2006 . . . ." (PSR dated Jan. 15, 2014 at ¶ 15; May
28, 2014 Tr. 16:1-2.) This evidence of record demonstrates
Defendant's involvement with CV1 dating back to at least
September 2006.

At that time, Defendant induced CV1, who was only 13, to
send Defendant pictures depicting very specific obscene images
of himself. (See Ex. 201.) Even if CV1 believed himself to be
communicating with "Brianna," an adolescent female, it is clear
from their chats that "Brianna" manipulated CV1 and eventually
used threats and intimidation to extort further images from him.
(Id.) CV1's involvement in a relationship founded upon such
manipulation and extortion, not to mention the appalling conduct
that Defendant coerced CV1 to engage in, would plausibly cause
severe harm to CV1 regardless of whether the coercion was
exercised by an adolescent female or a man in his mid-thirties.
In either case, CV1 is the child victim of a sexual predator who
preyed upon CV1's youthfulness for his own ends. Thus, the Court
finds it is appropriate to award restitution for mental health
care expenses incurred between September 2006 and April 2009.

The Government provided billing records for CV1's mental
health care covering the period from April 2009 through July
2014. As to these historic amounts, Defendant objects on grounds
that no psychiatric evaluation has been conducted and thus it
cannot be ascertained whether (or how much) therapy was required

10

due to CV1's abuse at Defendant's hands as opposed to any other causes. In essence, Defendant contends that CV1 may have required therapy for multiple issues and it cannot be determined what counseling can be specifically attributed to Defendant's abuse. (See, e.g., Aug. 7, 2014 Tr. 18:8-18, 42:14-16.) Defendant's argument is anathema to CV1 and all victims of child pornography.

Whether or not CV1 also requires counseling for other stressors in his life is immaterial to the question before this Court. In accordance with a Congressional mandate, the Court must determine the full amount of CV1's losses that were proximately caused by Defendant's criminal behavior. See § 2259; Paroline, 134 S. Ct. at 1726. Although CV1 did not learn of the full extent of Defendant's crime until Sergeant LaPorta spoke with him in July 2009,[9] CV1 began seeing a psychologist, Dr. Eliot Garson, regularly a few months before in April. (Gov.'s Mem., Ex. 2.) As discussed above, it is more likely than not – indeed, highly probable – that CV1 would require therapy for the trauma he suffered solely due to the sadistic nature of the images Defendant induced and coerced CV1 to send, even before he learned that he had sent those images not to "Brianna", as he

---

[9] According to the PSR, CV1 was identified on July 13, 2009. (PSR dated Jan. 15, 2014, at ¶ 27.) Sergeant LaPorta verified that he identified and met with CV1 and CV1's mother in early July 2009. (May 28, 2014 Tr. 132:20-133:4.)

believed, but to Bryan Jacobs. Then, as one would also expect,
CV1 required counseling upon his discovery that he had been
misled and was the victim of a sexual predator targeting
children. According to Dr. Garson, CV1 engaged in psychotherapy
in part to "understand[] the trauma he experienced from being a
target of a sexual predator," and that this issue was
"intricately woven" around other difficulties CV1 experienced.
(Gov.'s Mem., Ex. 2.) This evidence sufficiently demonstrates
that CV1 suffered significant harm as a result of Defendant's
criminal behavior, and that the therapy he engaged in from April
2009 forward was the result of Defendant's crime.[10]

Defendant next objects to an award of the expenses
associated with CV1's March-April 2014 crisis intervention on
grounds that those amounts were categorized as historic
expenses, which were described as including expenses incurred
only through 2011. The basis for this objection is unclear as

---

[10] The Court notes that CV1's apparent suicide attempt in
April 2013 occurred within the months leading up to Defendant's
June 2013 trial date (Exs. 5, 6). CV1 also expressed suicidal
thoughts around December 23, 2013 (Gov.'s Mem., Ex. 2), just a
few days after the Court adjourned Defendant's sentencing to
February 2014. Moreover, the March-April 2014 crisis
intervention occurred within weeks of this Court's Order
adjourning Defendant's sentencing again in light of the
Government's late submission of its sentencing memorandum. Thus,
while Defendant questions "what is the crisis in 2014 when [CV1]
was made aware of this some seven years ago" (Aug. 7, 2014 Tr.
44:24-45:4), there can be no doubt that Defendant's criminal
conduct presented such a crisis for CV1 during these times.

12

the Government included these amounts in its memorandum and provided to Defendant the billing records. As Defendant conceded that these records demonstrate CV1 in fact incurred these expenses, the Court finds that restitution for these expenses is appropriate.[11] Accordingly, the records of the historic expenses incurred from 2009 through 2014, as well as CV1's mother's assessment based upon her recollection of the expenses incurred during the earlier period, are thus sufficient on their face to justify an award of restitution in the amount of $60,000.

The Government also seeks restitution in the amount of $60,000 for future mental health care expenses. Defendant contends that no restitution for future mental health care should be awarded in light of a lack of evidence showing that CV1 sought treatment over the last four years. Defendant is incorrect. While the records demonstrate that CV1's therapy has tapered off since his family moved,[12] he has sought treatment and/or emergency intervention in 2013 and 2014. (Exs. 2, 5, 6.) For example, Dr. Graham Dondlinger submitted a letter noting

---

[11] Defendant also specifically challenged these expenses on the same grounds addressed above, i.e. that it cannot be determined whether CV1 sought treatment due to the trauma he sustained at Defendant's hands. As explained throughout this Opinion, the record contains sufficient evidence demonstrating CV1's need for therapy to address "intricately interwoven" issues that include CV1's abuse at Defendant's hands.

[12] The Government submitted no records indicating treatment was sought in 2012.

that he has been treating CV1's mental health since December 27,
2013, and has met with CV1 at least four times in 2014.[13] (Gov.'s
Mem., Ex. 2.) The records also show that CV1 met with Dr.
Dondlinger as recently as July 1, 2014, and has scheduled a
follow-up visit for September 19, 2014. (Id.) Dr. Dondlinger
opined that CV1 "needs a mental health professional to provide
counseling and behavioral therapy to work through his emotional
trauma" and is "expected to require long term follow up care."
(Id.) CV1's mother also estimates that CV1 will require therapy
for at least the next five years. (Gov.'s Mem., Ex. 1.) Thus,
the record demonstrates CV1's continued participation in
therapy, as well as his need for future therapy.

Congress and the courts have long recognized that victims
of child pornography offenses do and are expected to suffer the
after-effects long into the future, which often requires long-
term psychiatric care:

> "The use of children as subjects of pornographic
> materials is harmful to the physiological, emotional
> and mental health of the child." . . . "Children used
> in pornography are desensitized and conditioned to
> respond as sexual objects. * * * They must deal with
> the permanency, longevity, and circulation of such
> record of their sexual abuse." "Pornography poses an
> even greater threat to the child victim than does
> sexual abuse or prostitution. Because the child's

---

[13] CV1 texted his mother in December 2013, expressing
suicidal thoughts and asked her to contact "Elliot" for an
appointment or other help. (See Gov.'s Mem., Ex. 2.) Presumably,
CV1 referred to Dr. Eliot Garson. Soon thereafter, he began
seeing Dr. Dondlinger.

actions are reduced to a recording, the pornography
may haunt him in future years, long after the original
misdeed took place."

Child Pornography Prevention Act of 1995, S. Rep. No. 104-358,
at 14 (1996) (quoting New York v. Ferber, 458 U.S. 747, 456-60
(1982)); see also U.S. v. Goff, 501 F.3d 250, 259 (3d Cir.
2007). To account for the fact that "children victimized by
sexual abuse often do not recover quickly from their injuries,"
courts have held that § 2259 permits an award for future medical
expenses. U.S. v. Laney, 189 F.3d 954, 966 (9th Cir. 1999)
(quoting S. Rep. No. 104-358, at 14); see also U.S. v. Pearson,
570 F.3d 480, 487 (2d Cir. 2009) (recognizing restitution under
§ 2259 should be provided for costs of future counseling in case
involving possession and receipt of child pornography); see also
U.S. v. Danser, 270 F.3d 451, 455 (7th Cir. 2001). Indeed, the
Supreme Court recently reaffirmed the "common" knowledge that a
child victim in a pornography case "suffers continuing and
grievous harm as a result of her knowledge that a large,
indeterminate number of individuals have viewed and will in the
future view images of the sexual abuse she endured." Paroline,
134 S. Ct. at 1726; U.S. v. Breisacher, 2012 WL 2789065, at *2
(D.N.J. July 9, 2012) ("The Court begins by acknowledging that
'[i]t is beyond dispute that child pornography victims suffer
from trauma as a result of their sexual abuse, and that the
knowledge that anonymous individuals continue to view and

15

distribute images of their abuse exacerbates the victims' feelings of fear, anxiety, and powerlessness.'" (quoting U.S. v. Monzel, 746 F. Supp. 2d 76 (D.D.C. 2010)); see also U.S. v. Olivieri, 2012 WL 1118763, at *3-4 (D.N.J. April 3, 2012).

The Court finds it inappropriate and contrary to the purpose of the statute to penalize CV1 for his inability to submit a more formal estimate of the cost of future medical care when it is quite clear from the record (and common knowledge) that such future medical and psychological care will be required.[14] Defendant's argument that CV1's resort to mental health care and counseling appears to be tapering off through the years is not disputed. Accordingly, the Court will modify the request for future mental health care consistent with the record.

Using CV1's 2014 visits with Dr. Dondlinger as a benchmark, the record suggests CV1 will require approximately 8 counseling sessions per year. CV1's mother estimates that CV1's need for such care will continue for at least five years. (Gov.'s Mem., Ex. 1.) The Court agrees with the Government that five years is an extremely conservative estimate of CV1's need for future care, especially in light of Dr. Dondlinger's conclusion that

_____

[14] While CV1 was unable to submit a formal proposal, nothing prevented the Government from introducing the testimony of an expert.

16

CV1's "issues are going to be difficult to work through and
expected to require long term follow up care." (Gov.'s Mem. at
11, Ex. 2.)

As to the costs, the Government presented evidence of the
cost/session for three mental health care professionals (Exs. 5-
7), as well as the historic cost/session of Drs. Garson and
Dondlinger (Gov.'s Mem., Ex. 2), which average $172/session.
Thus, "[h]aving reviewed [CV1's] incurred expenses and
estimation of future costs and recognizing that a district court
has leeway to 'resolve uncertainties with a view towards
achieving fairness to the victim,'" U.S. v. Breisacher, 2012 WL
2789065, at *4 (D.N.J. July 9, 2012) (quoting United States v.
Innarelli, 524 F.3d 286, 294 (1st Cir. 2008)), the Court finds
that the record supports an award for future mental health care
amounting to $15,000 (rounding up the product of 8 sessions over
10 years at approximately $172/session).[15]

**Medical**

_____

[15] See also Paroline, 134 S. Ct. at 1727-28 ("At a general
level of abstraction, a court must assess as best it can from
available evidence the significance of the individual
defendant's conduct in light of the broader causal process that
produced the victim's losses. This cannot be a precise
mathematical inquiry and involves the use of discretion and
sound judgment."); U.S. v. Barkley, 2011 WL 839541, at *5 (M.D.
Pa. March 7, 2011) ("The court recognizes that mathematical
precision is not required in the damages calculation for a
restitution order and that the court need only be able to
estimate the victim's losses with some reasonable certainty."
(citations omitted)).

The Government also seeks restitution for past medical expenses amounting to $2,000, but offers only the statement of CV1's mother that she <u>vaguely</u> recalls spending approximately $2,000 at one point in time. (Gov.'s Mem., Ex. 2.) Despite having nearly two-and-a-half months to prepare for the restitution hearing, the Government failed to present evidence of the date or purpose of this expenditure, or any other evidence connecting this expense with Defendant's criminal behavior. Indeed, the Court afforded the Government the opportunity to have CV1's mother testify at the hearing, but the Government was unprepared to do so. In light of the lack of additional detail or any corroborating documentation, the Court finds CV1's mother's statement on this expenditure less persuasive. As such, the Court cannot award this amount as restitution.

**Future Education/Lost Income**

The Government also seeks an award of $181,000, consisting of the cost of an online GED preparation course and private tutoring totaling $4,000, tuition at a community or technical college totaling $21,000, and lost income totaling $156,000. Again, the Government relies solely upon the statement of CV1's mother in support of these figures. While the Court acknowledges that Defendant's criminal behavior is likely a contributing factor to CV1's current isolation and inability to participate

18

in the working world, how much of CV1's lost income can fairly be attributed to Defendant's misconduct cannot be determined on the record before this Court. These potential costs are too speculative and uncertain to form the basis of a restitution award, especially in light of the Government's failure to provide any evidence in support of CV1's mother's estimate. Thus, the Court finds that the Government has failed to demonstrate that these losses were proximately caused by Defendant's criminal conduct or to offer more than speculation as to the amount of any such losses, and thus restitution in this amount cannot be awarded. But see U.S. v. Brunner, 2010 WL 148433, at (W.D. N.C. Jan. 12, 2010) (awarding restitution for loss of future earnings where Government submitted an uncontested and detailed report in support of award).

**Conclusion**

In sum, the Court finds by a preponderance of the evidence that CV1 is entitled to restitution for historic and future mental health care in the amount of $75,000. See 18 U.S.C.A. § 3664; see also Olivieri, 2012 WL 1118763, at *3, *13.


Date: August 21, 2014

                        s/Renée Marie Bumb
                        RENÉE MARIE BUMB
                        UNITED STATES DISTRICT JUDGE


19